(Reap. Dec. 10125)

THE MERTHYR COMPANY, INC. *v.* UNITED STATES

Entry No. 8601, etc.

(Decided December 14, 1961)

*William Gilligan* for the plaintiff.

*William H. Orrick, Jr.,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the defendant.

LAWRENCE, Judge: The appeals for reappraisement, enumerated in the schedule attached to and made part of this decision, were submitted to the court for determination upon a written stipulation of facts.

Four importations of commutators were entered at the port of Baltimore between February 7, 1959, and July 1, 1959. The merchandise was entered by the plaintiff on the statutory basis of cost of production, as defined in section 402(f) of the Tariff Act of 1930 (19 U.S.C. § 1402(f)).

Appraisal was made on the basis of export value, as defined in section 402(b) of said act, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, Public Law 927, 84th Congress, 91 Treas. Dec. 295, T.D. 54165 (19 U.S.C. § 1401a(b)), which is conceded by the parties to be the proper basis for appraisement.

The question for determination is whether a manufacturer's termination bonus, so-called, which accrued when the imported commutators were sold in the United States, shall be treated as a part of the export value.

The essential facts of the case are not in dispute. Adversary counsel, in their briefs, point out that similar commutators, which were

imported prior to February 27, 1958, were appraised on the basis of cost of production. They were the subject of a decision by this court in which the same parties were involved, *The Merthyr Company, Inc.* v. *United States*, 44 Cust. Ct. 695, Reap. Dec. 9692, wherein it was held that the termination bonus was not a part of the usual general expenses of producing such merchandise, within the meaning of section 402(f) of the Tariff Act of 1930, and, therefore, did not enter into the statutory cost of production.

The parties are also in agreement that the factual situation in the two cases is substantially the same, except that in the earlier case the basis of appraisement was cost of production, while in the instant case the basis for appraisement is export value. Since no item of the appraisement other than the termination bonus was challenged, the correctness of all other elements of appraisement stands as presumptively correct. *United States* v. *Fritzsche Bros., Inc.*, 35 C.C.P.A. (Customs) 60, C.A.D. 371.

An examination of the written agreement of adversary counsel reveals the following pertinent facts:

Under date of July 23, 1953, Hoover, Ltd., of England and Dayton Precision Manufacturing Co. of Dayton, Ohio, entered into an agreement, a copy of which, marked exhibit A, is annexed to the stipulation. During the continuance of the agreement, Hoover was to sell to Dayton, under certain terms and conditions set forth in the agreement, "for re-sale in the United States of America and in Canada * * * such Hoover Moulded Commutators * * * as Dayton shall from time to time order from Hoover." It was further provided that "Dayton shall use its best endeavours during the continuance of this Agreement to promote and increase the sale of the said Commutators in Dayton's Area."

Hoover agreed not to sell the said commutators for export to Dayton's area, except in pursuance of this agreement "and to and for use in the end products of * * * The Hoover Company of North Canton, Ohio and The Hoover Company Limited of Canada and shall not license others to manufacture use and/or sell the said Commutators in Dayton's area during the continuance of this Agreement."

Another significant provision in said agreement is contained in article 10(b) thereof, which reads as follows:

Hoover may by notice in writing to Dayton forthwith terminate this Agreement if Hoover determines in its judgment that the continuation of this Agreement no longer is in Hoover's best interests. In such event Hoover thereafter shall pay to Dayton each calendar quarter during the period of five (5) years next succeeding the date of such termination Five per cent (5%) of the net invoice price of all sales of the said Commutators thereafter made to each customer to whom Dayton has previously sold the said Commutators prior to such termination. In the event of termination under this clause Dayton shall

furnish to Hoover a list of its customers to whom Dayton has previously sold the said Commutators prior to such termination.

Acting in accordance with the provisions of article 10(b), *supra*, the agreement was terminated December 31, 1955, and, thereafter, for a term of 5 years, Hoover became obligated to pay Dayton 5 per centum of the net invoice price of commutators sold to persons who previously purchased Hoover commutators from Dayton.

It is important to note here, however, that said percentage, also referred to as a "termination bonus," was not payable to purchasers of Hoover commutators who had not previously been customers of Dayton.

On January 1, 1956, The Merthyr Company, Inc., plaintiff herein, became the distributor of Hoover commutators in the United States. For convenience in securing the termination bonus payable to Dayton, arrangements were made that it would be paid to Dayton by the plaintiff, who would receive credit from Hoover for payment so made, and the parties have agreed that no termination bonus was paid on sales by Merthyr to purchasers who were not Dayton's customers prior to December 31, 1955.

With respect to the shipments of commutators involved in these proceedings, the bonus was paid to Dayton by Merthyr, since these shipments were for the firm of Black & Decker, a former customer of Dayton, and Merthyr received credit therefor from Hoover.

The issue is finely drawn.

Paragraph 22 of the stipulation states:

The sole question presented by the foregoing is whether or not the said termination bonus of 5% referred to in Exhibit A and added pursuant to the arrangement set forth in Exhibit B is or is not part of the statutory export value.

It is provided by the stipulation:

If the Court finds that such termination bonus is a part of the statutory export value, then it is agreed that the appraised value in each case may be affirmed.

Paragraph 24 of the stipulation further provides that:

If the Court finds that such termination bonus is not a part of the statutory export value, then it is agreed that the invoice price, less the sum of $1.175 for each 100 commutators, less sea freight and insurance, would be the proper appraised value, as representative of export value.

In the earlier case, Reap. Dec. 9692, *supra*, the Government contended that because the commutators there under consideration were manufactured especially for Black & Decker (as in the present case), pursuant to its specifications, and that Black & Decker had been a customer of Dayton prior to January 1, 1956, Hoover knew that prior to manufacture of the commutators the amount of the termination bonus would be applicable to such exported merchandise. On

that premise, it was argued that the termination bonus was, at the time of manufacture, an outlay upon which the sale price and profit should be calculated.

The court answered this argument by pointing out that acceptance of this contention would lead to absurd results in that shipments of commutators to previous customers of Dayton would be valued at a price including the value of the bonus, while like commutators shipped to a concern that had not been a customer of Dayton would not be subject to the bonus; hence, there would be no bonus percentage to include in the appraised value. Further, the court said that it could easily happen that two shipments of commutators of the same kind on the same day would have two different costs of production and that such a situation should be avoided in the absence of compelling reasons to the contrary.

In conclusion, the court observed:

No sound legal reasons have been advanced by counsel, and the court finds none which in its opinion would justify the conclusion that the amount of the termination bonus should be included in the appraised value of the subject merchandise.

Inasmuch as the methods of transacting business between Hoover, Ltd., and Black & Decker were conducted in substantially the same manner as in the former case, the foregoing reasons lead to a conclusion that the termination bonus formed no part of the export value of the shipments here under consideration.

Defendant's brief points out that the entry papers in each case before the court—

* * * show a *per se* unit price of $20.15 per 100 commutators which *per se* unit price includes certain amount for packing, inland freight, sea freight, insurance, and a 5 per cent bonus under a termination contract. The appraiser allowed the items of sea freight and insurance, while the importer claims in addition thereto an allowance for the termination bonus.

Thus, the freely offered price for export to the United States was $20.15 per 100 commutators. There is no evidence that these (such) goods could be purchased at the invoice price less the termination bonus. That item constituted one of several items, each one of which became an integral part of the *per se* unit value and purchase price of each commutator.

It is immaterial that the entry papers included "a 5 per cent bonus under a termination contract." That item was included as a result of an arrangement with the appraiser of merchandise at the port of New York whereby the appraiser would be informed of the agreement between Hoover and the other parties involved in the transaction and also preserve plaintiff's contention that the bonus being paid to Dayton should not be included in the export value. See exhibit B, attached to the stipulation.

The briefs and authorities cited by counsel have been carefully considered. The court finds nothing therein which should alter the conclusion reached herein, as the court sees no sound legal grounds for a decision that would result in the inclusion of the termination bonus in some shipments and not in others, where such or similar merchandise is involved.

Upon the record and for the reasons above expressed, the court makes the following findings of fact:

1. The merchandise consists of commutators exported from England between February 7, 1959, and July 1, 1959.

2. Said commutators were manufactured by Hoover, Ltd., of England and imported by The Merthyr Company, Inc., for the account of Black & Decker.

3. The merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra*, at values which included a so-called "termination bonus" of 5 per centum.

4. Pursuant to an agreement, dated July 23, 1953, between Hoover, Ltd., of England and the Dayton Precision Manufacturing Co., the latter, upon termination of said agreement by Hoover, Ltd., on December 31, 1955, was to receive from Hoover, Ltd., for a period of 5 years after said termination, upon sales to customers to whom Dayton had previously sold said commutators, a bonus of 5 per centum of the net invoice price to each such customer.

5. Sales of commutators manufactured by Hoover, Ltd., were thereafter made by plaintiff to Black & Decker, a former customer of the Dayton Co., and, as to such sales, the Merthyr Company, plaintiff herein, in accordance with its arrangement with Hoover, Ltd., paid to Dayton the amount of such termination bonus on the involved importations, and Hoover, Ltd., credited Merthyr Company with such payments.

6. That, as to sales of Hoover commutators made by the Merthyr Company to customers who had not purchased Hoover commutators from the Dayton Co. prior to January 1, 1956, the termination bonus payments were not made.

As conclusions of law, the court holds—

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement of the commutators in issue.

2. The termination bonus was not a part of the price, at the time of exportation of the commutators to the United States, at which such or similar commutators were freely offered for sale, by Hoover or other manufacturers for sale in the principal markets of England,

in the ordinary course of trade, for exportation to the United States.

3. That the statutory export value of the merchandise in controversy is the invoice price, less $1.175 for each 100 commutators, less sea freight and insurance.

Judgment will issue accordingly.